UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

LAURA RUSSO,

                        Plaintiff,

         v.

NEW YORK PRESBYTERIAN HOSPITAL,
NEW YORK HOSPITAL MEDICAL CENTER OF
QUEENS and DR. MARK ADKINS,

                        Defendants.

**<u>MEMORANDUM & ORDER</u>**
09-CV-5334 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Laura Russo brought the above-captioned action against Defendants New York

Presbyterian Hospital ("Presbyterian Hospital"), New York Hospital Medical Center of Queens

("Queens Medical Center"), and Dr. Mark Adkins ("Adkins"), alleging claims of hostile work

environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et*

*seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et*

*seq.* ("NYCHRL").[1]  Defendants moved for summary judgment.  The Court heard oral argument

on July 24, 2013, and dismissed Plaintiff's retaliation claims at oral argument.  For the reasons

set forth below, the Court grants Defendants' motions for summary judgment as to Plaintiff's

hostile work environment claims.

---

     [1]  Plaintiff filed Title VII hostile work environment and retaliation claims against
Presbyterian Hospital and Queens Medical Center, and NYSHRL and NYCHRL hostile work
environment and retaliation claims against Presbyterian Hospital, Queens Medical Center and
Adkins.

## I. Background

Plaintiff was hired by Presbyterian Hospital in 1994 as a perfusionist, a healthcare professional who operates the heart-lung machine during cardiac surgery "to support the physiological and metabolic needs of the surgical patient."[2] (Pl. Combined 56.1 ¶¶ 1, 3; Pl. Aff. ¶¶ 1, 4; Def. PH 56.1 ¶¶ 1–2; Def. QMC 56.1 ¶ 1, 3, 6; Adkins 56.1 ¶ 1.)[3] As part of her

---

[2] The facts in this memorandum and order are based on the parties' Rule 56.1 Statements: Presbyterian Hospital's Rule 56.1 Statement ("Def. PH 56.1"), Plaintiff's Response to Presbyterian Hospital's Rule 56.1 ("Pl. 56.1-PH"), Queens Medical Center's 56.1 Statement ("Def. QMC 56.1"), Plaintiff's Response to Queens Medical Center's Rule 56.1 Statement ("Pl. 56.1-QMC"), Adkins' Rule 56.1 Statement ("Def. Adkins 56.1"), Plaintiff's Response to Adkins' Rule 56.1 Statement ("Pl. 56.1-Adkins"), and Plaintiff's Rule 56.1 Combined Counter Statement of Facts ("Pl. Combined 56.1").

[3] Presbyterian Hospital moves to strike Plaintiff's Rule 56.1 Combined Counter-Statement of Facts on the grounds that "it is argumentative, interlocking, repetitive and based on hearsay and inadmissible evidence." (Def. Mot. to Strike at 1.) "Whether to grant or deny a motion to strike is vested in the trial court's sound discretion." *Peters v. Molloy Coll. of Rockville Ctr.*, No. 07-CV-2553, 2010 WL 3170528, at *1 (E.D.N.Y. Aug. 10, 2010) (citation and internal quotation marks omitted); *see also XAC, LLC v. Deep*, --- F. App'x ---, ---, 2013 WL 1338490, at *1 (2d Cir. Apr. 4, 2013) (reviewing the district court's denial of a motion to strike for abuse of discretion and stating that the district court's decision will only be disturbed if it was "manifestly erroneous"); *Turner v. NYU Hospitals Ctr.*, 470 F. App'x 20, 26 (2d Cir. 2012) (reviewing the district court's denial of a motion to strike for abuse of discretion). "When seeking to strike, the moving party bears a heavy burden, as courts generally disfavor motions to strike." *Peters*, 2010 WL 3170528, at *1 (quoting *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, No. 05-CV-776, 2007 WL 2728898, at *1 (E.D.N.Y. Sept. 14, 2007)). Plaintiff's Rule 56.1 Combined Counter-Statement of Facts is supported by Plaintiff's sworn Affidavit. Rather than analyze Plaintiff's Combined Counter-Statement line by line in response to Defendant's motion to strike, the Court will ignore the portions of Plaintiff's affidavit that are not based on personal knowledge. *See Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *4 (S.D.N.Y. Jan. 24, 2007) (stating that, in response to a motion to strike, a court may instead "decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible" (citation and internal quotation marks omitted); *see also Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410, 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012) ("[C]ourts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions."), *report and recommendation adopted in relevant part*, No. 09-CV-1410, 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013); *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999) ("[R]ather than scrutinizing each line . . . and discussing whether they contain conclusory allegations, legal arguments, or hearsay . . . the Court, in its analysis of the motion for summary

employment, Plaintiff was assigned to work with cardiac surgical teams in two locations, Presbyterian Hospital and Queens Medical Center, until her termination on May 28, 2008. (Pl. Combined 56.1 ¶¶ 2, 4; Pl. Aff. ¶¶ 3, 5; Def. PH 56.1 ¶ 35.) Adkins was one of the surgeons with whom Plaintiff worked during her tenure at Presbyterian Hospital and Queens Medical Center. (Def. PH 56.1 ¶¶ 4, 20; Def. QMC 56.1 ¶ 4.) Adkins was employed by a non-party, the Weill Cornell Medical College ("Weill Cornell").[4] (Def. PH 56.1 ¶ 4; Def. QMC 56.1 ¶ 4; Def. Adkins 56.1 ¶ 4.)

### a. Dr. Adkins' Inappropriate Comments

Plaintiff alleges that from September 2004 until May 2008, Adkins treated Plaintiff and all women, in an "inappropriate and demeaning manner" on a regular basis. (Pl. Combined 56.1 ¶¶ 6–7, 13; Pl. Aff. ¶¶ 7–8.) According to Plaintiff, Adkins made "comments of an underlying sexual nature" and acted "in a physically intimidating manner towards women." (Pl. Combined 56.1 ¶ 7; Pl. Aff. ¶ 8.) During surgery, Adkins referred to a chest tube as a "mister softie," and requested a pair of 36 chest tubes by asking for a "pair of 36s" while holding "his hands as if he were grabbing a woman's breasts." (Pl. Combined 56.1 ¶¶ 6–8, 13; Pl. Aff. ¶ 9; Hussey Dep. 34:25–35:3; Adkins Dep. 125:2–12.) Adkins made these references and hand motions when new personnel were added to the operating room team. (Pl. Combined 56.1 ¶ 10.) Adkins admits to making the hand gesture on one occasion while referring to a pair of 36s. (Adkins Dep. 125:2–

---

judgment, will only consider relevant evidence that is admissible."). Presbyterian Hospital's motion to strike is therefore denied. In addition, objections by Defendants to the documents submitted by Plaintiff will be addressed as specific objections arise.

[4] Plaintiff asserts that Adkins was also an employee of Presbyterian Hospital and Queens Medical Center. (Pl. Combined 56.1 ¶¶ 195–202.) Adkins' offer letter of employment states that he was an employee of Weill Cornell. (Pl. Ex. I.) It further states that he was appointed to perform work at both Presbyterian Hospital and Queens Medical Center. (*Id.*)

12.)  Plaintiff perceived these comments as sexual in nature.[5]  (Pl. Combined 56.1 ¶ 8.)  Karen Hussey, a perfusionist who worked with Plaintiff, heard Adkins call the chest tube a "mister softie," but she did not interpret this as a sexual comment or find the reference offensive. (Hussey Dep. 34:25–35:24.)  From approximately September 2004 until her termination in 2008, Plaintiff complained about Adkins to her supervisor, William DeBois, the Chief Perfusionist at Presbyterian Hospital.  (Pl. Combined 56.1 ¶ 11.)  Plaintiff specifically complained to DeBois in 2006 that Adkins' references to a "pair of 36s" and a "mister softee" were inappropriate.  (*Id.*)

**b. October 2007 Incidents in Perfusion Office**

Plaintiff recalls two incidents in October 2007 which Plaintiff argues demonstrate that Adkins treated her inappropriately because of her gender.  In the first incident in October 2007, Adkins was sitting in the perfusion office with his feet on the desk while reading a newspaper or magazine.  (Pl. Combined 56.1 ¶ 31.)  Plaintiff said "excuse me," as she needed to move past Adkins in order to retrieve a piece of equipment required for a medical procedure.  (*Id.*)  Adkins replied "no problem," and lifted one leg off the desk to allow Plaintiff to move past him.  (*Id.*) As Plaintiff started to move towards him, Adkins blocked her path by leaning forward and refusing to lift his other leg.  (*Id.*)  Adkins' actions left Plaintiff  "stuck directly in front of [Adkins'] crotch" and she felt "trapped."  (*Id.* ¶ 31–34.)  Plaintiff again said "excuse me."  (*Id.* ¶ 31.)  Adkins removed his other leg from the desk, allowing Plaintiff to proceed and to retrieve

---

[5]  Plaintiff also alleges that upon information and belief, Adkins played sexually charged music during operations.  (Pl. Combined 56.1 ¶ 15; Pl. Aff. ¶ 12.)  Plaintiff does not claim to have personal knowledge of Adkins playing sexually charged music during procedures, but claims that she heard this from "other female co-workers who were present in the room while this music was playing."  (Pl. Aff. ¶ 12.)  Presbyterian Hospital contests this fact because it is not based on personal knowledge.  (Def. PH Mot. to Strike ¶ 15.)  Adkins admits that he played inappropriate music in the operating room in 2006 when Plaintiff was not present.  (Adkins Decl. ¶¶ 32–33.)  Adkins alleges that he downloaded the music to his iPod inadvertently and that the music was stopped immediately.  (Adkins Decl. ¶ 33.)  Plaintiff does not rely on this incident in her opposition to Defendants' motions for summary judgment.

the equipment. (*Id.*) Adkins denies blocking Plaintiff or trapping her. (Adkins Dep. 103:11–104:3.) In the second incident, also in October 2007, Adkins "brushed up against" Plaintiff as he was passing her in the perfusion office. (Pl. Combined 56.1 ¶ 36.)

After these two incidents in October 2007, Plaintiff told her coworker Pat Esposito about the incidents, and Plaintiff believes Esposito then told DeBois. (Pl. 56.1 ¶¶ 37–39.) DeBois subsequently asked Plaintiff "why she did not mention this to him," and Plaintiff replied that she would prefer not to get involved because she thought that would "make matters worse" and she feared retaliation. (Pl. 56.1 ¶ 40; Pl. Dep. 181:8–182:8.) DeBois offered to speak with Adkins, but Plaintiff felt that if DeBois approached Adkins about the incidents, "it would only make matters worse." (Pl. Dep. 223:10–224:16.) DeBois, Presbyterian Hospital and Queens Medical Center deny that Plaintiff or Esposito made these complaints. (Def. PH Mot. to Strike ¶¶ 11, 16; DeBois Dep. 16:6–9.)

### c. May 15, 2008 Operating Room Incident

On May 15, 2008, Plaintiff worked at Presbyterian Hospital from 7:00 a.m. to 3:00 p.m. and was then "on-call" at Queens Medical Center from 3:00 p.m. to 8:00 p.m. (Pl. Combined 56.1 ¶ 47.) While "on call" at Queens Medical Center, Plaintiff was assigned to assist the primary perfusionist, Karen Hussey, who was responsible for operating the heart-lung machine for a patient undergoing emergency open heart surgery being performed by Adkins. (Def. PH 56.1 ¶¶ 4, 6.) After the patient was removed from the heart-lung machine, but before the surgery was completed, Plaintiff went home at approximately 9:15 p.m. (Def. PH 56.1 ¶ 7; Def. QMC 56.1 ¶ 10; Def. Adkins 56.1 ¶¶ 14–16; Pl. Dep. 40:9–10, 51:25.) Plaintiff did not inform Adkins or her supervisor that she was leaving the operating room. (*Id.* at ¶ 9.) Plaintiff claims that she did speak with Hussey prior to leaving and that Hussey told her to leave. (Pl. Aff. ¶¶ 46, 50, 53, 54.)

After Plaintiff left the hospital, an emergency arose that required the patient to be placed back on the heart-lung machine.  (Def. PH 56.1 ¶ 12; Def. QMC 56.1 ¶ 10; Def. Adkins 56.1 ¶ 17.)  Hussey had trouble getting the patient back on the machine, and Plaintiff was ordered to return to work because "the patient was dying."[6]  (Def. PH 56.1 ¶¶ 15, 22; Def. QMC 56.1 ¶11–13; Pl. Dep. 70:22–72:11; Hussey Dep. 53:13–24.)  The patient had been successfully restored to the heart-lung machine by the time Plaintiff returned to work.  (Pl. Combined 56.1 ¶ 79; Pl. Aff. ¶ 62; Def. PH Mot. to Strike ¶ 79; Def. QMC 56.1 ¶ 13.)

When Plaintiff arrived at the operating room, Adkins yelled at Plaintiff and the entire staff because he was upset about Plaintiff's departure and the emergency situation that had occurred with the patient.  (Def. PH 56.1 ¶ 23; Def. QMC 56.1 ¶ 14; Adkins Dep. 52:5–24; Pl. Combined 56.1 ¶¶ 82–84, 86, 88–90.)  Adkins' verbal outburst included the use of many profanities, several of which were directed solely at Plaintiff.  (Pl. Combined 56.1 ¶¶ 82–84, 86, 88–90; Pl. Aff. Ex. D, E.)   Plaintiff felt that Adkins had verbally attacked her and that some of his comments were sexual in nature, as they related to her having a "Chinese boyfriend" and included the use of the word "f*ck" many times.[7]  (Pl. Combined 56.1 ¶¶ 81, 87; Pl. Aff. ¶ 64; Pl. Dep. 169:8–19.)  Adkins admits that many of his comments were inappropriate and derogatory.  (Adkins Dep. 52:21–24.)

---

[6] Hussey was placed on a six-week suspension from Queens Medical Center and was assigned to work at a different hospital because she had difficulty getting the patient back on the machine during this incident.  (Hussey Dep. 78:25–79:14.)

[7] Some of the remarks made by Adkins were, "Don't you ever f*cking do that again," "Is this your plan, your f*cking plan, to get your f*cking Chinese boyfriend back here," "Kiss my ass goodbye after tonight," "[O]h, f*ck me, Jesus Christ."  (Pl. Combined 56.1 ¶ 81; Pl. Aff. ¶ 64.)  Although Plaintiff claims that she felt that some of Adkins' comments were sexual in nature, Plaintiff admitted in her sworn deposition testimony that Adkins' comments were vulgar but not sexual in nature, and arose out of Adkins' anger, dislike of individuals loyal to his predecessor and fear for his job.  (*See infra* Part II.c.)

Plaintiff attempted to get in touch with several supervisors while the incident was still occurring. Plaintiff called Barbara Elmer, the supervisory perfusionist, to complain about Adkins' "abusive physician behavior," and requested Elmer's presence at the operating room because of Adkins' behavior towards her. (Pl. Combined 56.1 ¶¶ 96–97; Pl. Dep. 151:2–19.) Plaintiff also emailed DeBois, who was on vacation at the time, to let him know about the situation and asked DeBois to call her or Hussey as soon as possible. (Pl. Combined 56.1 ¶¶ 77, 94; Pl. Aff. Ex. M.) Plaintiff spoke with DeBois on the telephone the following day. (Pl. Combined 56.1 ¶ 110; Pl. Aff. ¶ 82; Def. PH Mot. to Strike ¶ 110.) The parties dispute what was discussed and whether Plaintiff complained to DeBois about sexual harassment or discrimination. (Pl. Combined 56.1 ¶ 110; Pl. Aff. ¶ 82; Def. PH Mot. to Strike ¶ 110.) According to Plaintiff, she told DeBois that "Dr. Adkins had harassed and discriminated against [her]," (Pl. Combined 56.1 ¶ 110; Pl. Aff. ¶ 82), and DeBois received her complaint, apologized, and told her it was "alright" that she left Queens Medical Center when she did, (Pl. Combined 56.1 ¶ 110; Pl. Aff. ¶ 82). According to DeBois, Plaintiff told him that there was an incident at Queens Medical Center involving Dr. Adkins while she was "doing a case with Karen [Hussey]," and he told her that they would discuss the events when he returned from vacation. (Def. PH Mot. to Strike ¶ 110; DeBois Dep. 21:17–22:6.)

DeBois returned from his vacation on Monday, May 19, 2008, and met with the perfusionist team for a staff meeting to discuss the events that occurred on the evening of May 15, 2008. (Def. PH 56.1 ¶¶ 25–26; Pl. 56.1-PH ¶¶ 25–26.) Plaintiff claims that at the meeting, DeBois stated that Plaintiff was "technically . . . off," but announced that in the future, no one should leave before the patient is out of the operating room. (Pl. Dep. 92:8–24.)

Defendant claims that during the meeting, DeBois told Plaintiff that she should not have left the operating room before the patient. (Def. PH 56.1 ¶ 26; Pl. 56.1-PH ¶¶ 25–26; Pl. Dep. 92:8–24.)

### d. Plaintiff's Complaints After the May 15, 2008 Operating Room Incident

After the staff meeting on May 19, 2008, Plaintiff spoke with DeBois about the incident. (Def. PH 56.1 ¶ 27; Pl. 56.1-PH ¶ 27.) According to Plaintiff, she complained about the harassment and "requested to have a meeting with DeBois and Adkins, in order to resolve concerns about sexism, language, vulgarity and harassment that she had been subjected to." (Pl. Aff. ¶¶ 83–84.) Plaintiff also told DeBois that she was going to complain to the human resources department, but DeBois dissuaded her from doing so by stating that he could handle the matter, that complaining would only make it worse, and that "although retaliation is illegal it is also very real." (Pl. Combined 56.1 ¶¶ 113–114; Pl. Aff. ¶¶ 84–85.) According to DeBois, Plaintiff only complained about the cursing and did not complain about sexual discrimination or harassment. (Def. PH 56.1 ¶ 27; DeBois Dep. 14:17–15:6, 130:9–23.)

Plaintiff continued to work, including participating in a surgery with Adkins, until she was informed by DeBois on May 20, 2008, that she was relieved of her duties pending an investigation of the May 15, 2008 operating room incident.[8] (Def. PH 56.1 ¶ 30.) Plaintiff had previously been disciplined for leaving Queens Medical Center prior to the end of her shift in September 2007 and this was reflected on her performance review in April 2008.[9] (Def. PH 56.1

---

[8] According to Plaintiff, when DeBois communicated that she was being relieved of her duties pending an investigation, he indicated that he had told the human resources department "[her] side" of the incident. (Pl. Aff. ¶¶ 90–91.) However, in an email from DeBois to Rachel Bautista, Presbyterian Hospital's human resources representative, which details the May 15, 2008 operating room incident and subsequent meeting, no mention is made of Plaintiff's harassment complaint. (Pl. Aff. Ex. P.)

[9] Following the prior incident in September 2007, Plaintiff was suspended for two days and given a written warning indicating that any further incident could lead to disciplinary action

¶¶ 16–17, 21; Pl. 56.1-PH ¶ 16–17, 21; Adkins 56.1 ¶ 6.)  On May 22, 2008, Plaintiff spoke with Rachel Bautista, the human resource representative, about her concerns, which, according to Plaintiff, included harassment, discrimination and retaliation.  (Pl. Combined 56.1 ¶ 127; Pl. Aff. ¶ 92.)  Bautista told Plaintiff that she had not received any information about Plaintiff's harassment complaints from DeBois and only knew about Plaintiff having left the operating room the night of the May 15, 2008 operating room incident.  (Pl. Combined 56.1 ¶ 130; Pl. Dep. 102:5–20.)  Bautista advised Plaintiff to file a formal written complaint.  (Pl. Aff. ¶¶ 94, 96.)

Plaintiff filed a formal written complaint which was a summary of Adkins' verbal outburst on May 15, 2008.  (Pl. Combined 56.1 ¶¶ 133, 135; Pl. Aff. ¶¶ 94, 96; Pl. Aff. Ex. E.)  The complaint stated that Plaintiff felt harassed, and it included many of the remarks made by Adkins on May 15, 2008.  (Pl. Combined 56.1 ¶¶ 133, 135; Pl. Aff. ¶¶ 94, 96; Pl. Aff. Ex. E.)  Plaintiff's written complaint did not include any reference to sexual harassment or to discrimination.  Plaintiff claims that although the formal written complaint only refers to harassment and does not explicitly state sexual harassment, it was implied that she meant sexual harassment, and that she verbally communicated this to Bautista.  (Pl. Combined 56.1 ¶136; Pl. Dep. 302:22–305:12.)  According to Presbyterian Hospital, Plaintiff only complained to Bautista about Adkins' vulgar language and did not complain about sex discrimination, harassment, or retaliation.  (Def. PH Mot. to Strike ¶ 127; Bautista Dep. 18:13–20.)  Bautista advised Plaintiff to

_____

"up to and including termination."  (Pl. Aff. Ex. J.)  On the same day in September 2007, Hussey also left early, but was not disciplined.  (Pl. Combined 56.1 ¶ 23; Hussey Dep. 28:3–18, 30:15–22.)  Presbyterian Hospital claims that the circumstances between Plaintiff and Hussey were different in September 2007.  (Def. PH Mot. to Strike ¶ 23.)  According to Presbyterian Hospital, Hussey regarded Plaintiff as her "senior," and Plaintiff told Hussey to leave shortly before Hussey's shift ended, and advised Hussey that Plaintiff would stay until the conclusion of Plaintiff's shift, but instead, Plaintiff left "hours before her shift ended, leaving no one at the Hospital to provide perfusion services."  (*Id.*)  According to Plaintiff, it was the practice of perfusionists to leave before their shift was over.  (Pl. Dep. 54:3–25, 58:15–23.)

make a formal complaint to the human resources department at Queens Medical Center. (Pl. Combined 56.1 ¶ 133; Pl. Dep. 107:8–24.) Shortly after Plaintiff complained to Bautista, Adkins faxed a letter to Bautista complaining that Plaintiff had left during surgery and that Plaintiff's actions did not meet the standard of care at Queens Medical Center and that he trusted that Bautista would, "take the appropriate action to resolve this situation." (Pl. Comb. 56.1 ¶ 145; Pl. Dep. 94:16–95:15; Pl. Aff. Ex. S.)

On May 27, 2008, Plaintiff complained to Kristen Friedl and Frank Dumont of Queens Medical Center's human resources department regarding the operating room incident. (Def. QMC 56.1 ¶ 29.) Plaintiff provided Friedl and Dumont with a written summary of curses used by Adkins during the operation room incident which described "abusive physician behavior" and "harassment" but did not mention sexual harassment. (Def. QMC 56.1 ¶ 29; Def. QMC Ex. F.) According to Plaintiff, she told Friedl and Dumont verbally that she was claiming "sexual harassment." (Pl. Dep. 302:3–303:15.) Queens Medical Center conducted an investigation into Plaintiff's complaint. (Def. QMC 56.1 ¶ 31.) Queens Medical Center's chief medical officer met with Adkins to admonish him about his conduct during surgery and to advise him that such conduct could not be repeated.[10] (Def. QMC 56.1 ¶ 33.)

### e. Plaintiff's Termination

On May 28, 2008, Presbyterian Hospital terminated Plaintiff's employment for her unauthorized departure on the evening of May 15, 2008.[11] (Def. PH 56.1 ¶ 35; Pl. Aff. Ex. T.)

_____

[10] Other than wishing Queens Medical Center had finished its investigation prior to her termination by Presbyterian Hospital and that Queens Medical Center had made Adkins apologize to her, Plaintiff has no complaints about the manner in which Queens Medical Center handled the incident. (Pl. Dep. 408–12.)

[11] Queens Medical Center asserts that it had no involvement in the decision to terminate Plaintiff. (Def. QMC 56.1 ¶ 32.) Plaintiff states that she "is not aware if anyone at [Queens

The parties dispute whether Plaintiff actually left prior to the end of her shift. (Def. PH 56.1 ¶¶ 10, 16, 26; Pl. Combined 56.1 ¶ 72.) According to Presbyterian Hospital, when there is an ongoing cardiac surgery, the perfusionist's shift is not over until the patient has safely left the operating room, or the surgeon tells the perfusionist he or she can leave. (Def. PH 56.1 ¶ 10; DeBois Dep. 34:17–36:7.) Plaintiff alleges that her shift had already ended because she left after her scheduled shift end time, the patient was off the heart-lung machine, and she departed only after being directed to leave by Hussey who was the primary perfusionist. (Pl. Combined 56.1 ¶¶ 58, 62, 67, 71–72; Pl. Aff. ¶¶ 46, 50, 53, 54; Pl. Dep. 51:20–24.) Plaintiff claims that DeBois told her during the staff meeting on May 19, 2008, that she was technically off duty. (Pl. Dep. 92:8–14, 93:8–22.) Plaintiff also claims that it was standard procedure to leave after the end of a work shift if the patient is "off bypass," or no longer connected to the heart-lung machine.[12] (Pl.

---

Medical Center] made a decision to terminate her employment or if anyone at [Queens Medical Center] advised [Presbyterian Hospital] to terminate her employment." (Pl. 56.1-QMC ¶ 32.)

[12] Plaintiff submitted three notarized letters from registered nurses who worked at Queens Medical Center describing the regular practice of the perfusionists at Queens Medical Center, as additional support for the claim that it was standard procedure for the secondary perfusionist to leave after the patient had been removed from the heart-lung machine and the primary perfusionist felt it was safe for the secondary perfusionist to leave. (Pl. Aff. Ex. L, CC; Pl. Combined 56.1 ¶¶ 63–64.) Presbyterian Hospital objects to the use of these letters on the grounds that they are unsworn or were written by individuals without personal knowledge of the the procedures at Presbyterian Hospital. (Def. PH Mot. to Strike ¶¶ 63–64, 181.) Unsworn letters and statements made without personal knowledge are not admissible evidence under Rule 56 of the Federal Rules of Civil Procedure and cannot be considered in connection with a summary judgment motion. *See Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. 2013) (explaining that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge" under Rule 56(c)(4), and "a court may, in considering a motion for summary judgment, simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible"); *Fall v. N.Y.S. United Teachers*, 289 F. App'x 419, 421 n.3 (2d Cir. 2008) (finding that unsworn audiologist reports offered by the plaintiff constitute "inadmissible hearsay evidence"); *Sepanski v. Jani-King, Inc.*, No. 10-CV-518S, 2013 WL 4455412, at *2–3, 8 (W.D.N.Y. Aug. 16, 2013) (holding that three letters submitted by the plaintiff that were not sworn, the contents were not stated to be

Dep. 54:3–25, 58:15–23.) The parties also dispute the extent to which Plaintiff's complaint to Presbyterian Hospital was investigated or considered by Presbyterian Hospital in deciding to terminate Plaintiff. According to Presbyterian Hospital, the decision to terminate Plaintiff was made prior to Plaintiff's oral and written complaint to Bautista following the May 15, 2008 operating room incident, and since Adkins did not exhibit any "abusive physician behavior" prior to Plaintiff's departure from the operating room, Presbyterian Hospital decided to adhere to its decision to terminate Plaintiff even after receiving Plaintiff's complaint about Adkins. (Def. PH 56.1 ¶¶ 31–32, 34–35; Bautista Dep. 22:5–12, 26:1–27:19.) According to Plaintiff, Presbyterian Hospital did not investigate her complaints of sexual harassment against Adkins before her termination, although Bautista advised Plaintiff that her complaint would be considered before any decision was made. (Pl. Combined 56.1 ¶¶ 133, 137, 141–143; Pl. Aff. ¶¶ 94, 97; Bautista Dep. ¶¶ 25:4–26:16, 27:10–28:2, 28:7–13.) According to Bautista, she did not speak to Adkins or Hussey to investigate the incident, nor does she know of any investigation of, or final determination about, Plaintiff's complaint.[13] (Bautista Dep. 24:19–23, 26:5–9, 28:18–29:4.) Plaintiff never received any information from Presbyterian Hospital confirming whether they had investigated her complaint. (Pl. Combined 56.1 ¶ 163; Pl. Aff. ¶ 102.) Presbyterian Hospital

_____

true and correct, and were not stated under penalty of perjury were "merely signed by a notary" and could not be considered in connection with a motion for summary judgment); *White v. Sears, Roebuck & Co.*, No. 07-CV-4286, 2009 WL 1140434, at *3 n.4 (E.D.N.Y. Apr. 27, 2009) (explaining that unsworn documents cannot be considered by the court on a motion for summary judgment, even if they are notarized). Although the practice of perfusionists at Queens Medical Center is relevant evidence since Plaintiff, although employed by Presbyterian Hospital, was working regularly at Queens Medical Center, all three notorized letters were unsworn and are therefore disregarded.

[13] Plaintiff has submitted an email written by a woman named Lorraine Orlando to Bautista's supervisor and forwarded from Bautista's supervisor to Bautista referring to Presbyterian Hospital's ongoing investigation into Plaintiff's "charge of harassment." (Pl. Ex. X.)

asserts that Plaintiff never made a complaint of gender discrimination or harassment. (Def. PH Mot. to Strike ¶ 163.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*, --- F.3d ---, ---, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has "cautioned that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, --- F. App'x ---, ---, 2013 WL 1943274, at *1 (2d Cir. May 13, 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b. Statute of Limitations

Defendants assert that Plaintiff's claims under federal, state and city law are time barred. (QMC Mem. 26–27; QMC Reply 13–15; Adkins Mem. 13–14; PH Reply 16.)  For the reasons set forth below, the Court finds that all Title VII hostile work environment claims against Presbyterian Hospital and Queens Medical Center that accrued prior to November 22, 2007 are time-barred.  Plaintiff's state and city law hostile work environment claims against Presbyterian Hospital and Queens Medical Center that accrued prior to November 24, 2005 are time-barred, and Plaintiff's state and city law claims against Adkins that accrued prior to May 19, 2007 are time-barred.

### i. Statute of Limitations — Title VII Claims

Plaintiff's Title VII claims prior to November 22, 2007, are time barred pursuant to the 300-day statute of limitations set forth in Title VII.  *See* 42. U.S.C. §2000e-5(e)(1).  In New York, a plaintiff has 300 days after the alleged discriminatory incident to file a claim with the EEOC.  *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125–126 (2d Cir. 2010); *Klein v. N.Y. Univ.*, No. 07-CV-0160, 2008 WL 3843514, at *2 (S.D.N.Y. Aug. 14, 2008) (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).  Plaintiff filed her EEOC claim on September 17, 2008.  (Def. QMC Mem. 27.)  Therefore, all Title VII claims that are based on conduct that occurred before November 22, 2007, 300 days prior to September 17, 2008, are time-barred.

Plaintiff alleges that Adkins made "comments of an underlying sexual nature" and acted "in a physically intimidating manner towards women" from September 2004 through Plaintiff's termination in 2008, and under the continuing violation doctrine, all of Adkins' conduct is within the statute of limitations.  (Pl. Opp'n 33; Pl. Combined 56.1 ¶¶ 6–7, 13; Pl. Aff. ¶¶ 7–8.)  However, Plaintiff has not provided evidence of *any* specific conduct that occurred on or after

November 22, 2007, other than the operating room incident on May 15, 2008, which, as discussed below, was not gender-based conduct. Therefore, Plaintiff cannot demonstrate a continuing violation exception to the statute of limitations period.

Under the continuing violation exception to the Title VII limitations period, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155–56 (2d Cir. 2012) (citations and internal quotation marks omitted); *see also Jackson v. N.Y. Office of Mental Health*, No 11-CV-7832, 2012 WL 5862741, at *2 (S.D.N.Y. Nov. 15, 2012) ("The continuing violation exception makes violations that took place prior to the expiration of the statute of limitations actionable if they are part of a 'continuous policy and practice of discrimination' and at least one act in that policy and practice took place within the limitations period." (quoting *Fitzgerald*, 251 F.3d at 359)). Since "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" the entire time period of the alleged hostile environment "may be considered by a court for the purposes of determining liability" if "an act contributing to the claim occurs within the filing period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (stating that, because hostile work environment claims occur "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own," the court may consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, . . . for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period" (quoting

*Morgan*, 536 U.S. at 105)); *Caravantes v. 53rd St. Partners, LLC*, No. 09-CV-7821, 2012 WL 96474, at *7 (S.D.N.Y. Jan. 12, 2012) ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice'. . . . Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." (quoting *Morgan*, 536 U.S. at 117)). Thus, in hostile work environment cases where there is a continuing violation claim, "if any act falls within the statutory time period," the Court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." *McGullam*, 609 F.3d at 76 (internal quotation marks omitted) (quoting *Morgan*, 536 U.S. at 120); *see also Raneri v. McCarey*, 712 F. Supp. 2d 271, 281 (S.D.N.Y. 2010) ("To defeat the statute of limitations by applying the continuing violation theory, the evidence must show that such a hostile environment was created prior to, and continued into, the [statutory time period]."). The Second Circuit has held that, under *Morgan*, the Court is required "to make an individualized assessment of whether incidents and episodes are related." *McGullam*, 609 F.3d at 76. A "sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related." *Id.* at 77.

The only conduct Plaintiff complained of on or after November 22, 2007, is the May 15, 2008 operating room incident. The Court must therefore determine whether that incident is "sufficiently related" to the other alleged offensive conduct such that it is "part of the same alleged hostile work environment practice." *McGullum*, 609 F.3d at 76; *see e.g. Caravantes*, 2012 WL 96474, at *7–8 (finding that a campaign of harassment that began with sexual touching and escalated to genital groping and oral intercourse constituted a continuing violation because

16

"the genital groping and oral intercourse began prior to the statutory time period and persisted");

*Lamar v. Inst. for Family Health*, No. 09-CV-1154, 2011 WL 2432925, at \*9 (N.D.N.Y. June 16, 2011) (holding that the continuing violation doctrine applied to a series of discriminatory acts by an offender, with whom plaintiff had previously had an extramarital affair, because each act was based on plaintiff's gender, and plaintiff claimed that the offender's behavior was "motivated by his jealousy and need to control" plaintiff), *aff'd*, 472 F. App'x 98 (2d Cir. 2012); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 582 (S.D.N.Y. 2011) (finding that the continuing violation doctrine applied to plaintiff's hostile work environment claim based on sexual comments, gestures, and acts, because at least one act of sexual harassment occurred within the statute of limitations period).

Plaintiff has alleged "inappropriate comments and actions of a sexual nature" by Adkins, which began prior to the statutory time period, based on Adkins' references to a chest tube as "a pair of 36s" and another as "mister softie," and two incidents in October 2007 when Adkins made Plaintiff feel physically uncomfortable. (Pl Opp'n 19–20.) However, Plaintiff has offered no evidence that Adkins made a sexual reference or inappropriately touched or approached her on or after November 22, 2007. (*See supra* note 7; *see also infra* Part c.) According to Plaintiff's description of Adkins' verbal outburst during the operating room incident on May 15, 2008, Adkins verbally attacked her and uttered numerous curses, such as (1) "Don't you ever f\*cking do that again," (2) "Kiss my ass goodbye after tonight," (3) "Can anyone f\*cking pump a cardiopulmonary bypass circuit?," (4) "F\*cking bullsh\*t g\*ddamn it!," (5) "Maybe [Plaintiff] has a g\*ddamn play book that can teach me how to do the f\*cking surgery," (6) "No one takes their job seriously. I don't even give a sh\*t anymore," (7) "Jesus f\*cking Christ, do you really think this guy can actually come off. Get f\*cking serious," (8) "[W]hose ass tomorrow? Who's

[sic] ass?  My f*cking ass, [the CEO of Queens Medical Center] will have my ass tomorrow,"
(9) "Did [DeBois] ever f*cking call me back," (10) "[O]h, f*ck me, Jesus Christ.  I can't f*cking
believe this," (10) "[T]his is a f*cking joke, could this case get any more f*cked up," and
(11) "[M]ove the f*cking table."  (Pl. Combined 56.1 ¶¶ 81–82; Pl. Aff. ¶ 64.)  At one point
Adkins asked Plaintiff whether this was her plan to get her "f*cking Chinese boyfriend back
here," referring to Dr. Ko, Adkins' predecessor.  (Pl. Combined 56.1 ¶¶ 81, 83; Pl. Aff. ¶¶ 64–
65.)  Plaintiff concedes that she did not believe that Adkins was "inferring" that Dr. Ko was, in
fact, her boyfriend.  (QMC 56.1 ¶ 15; Pl. 56.1-QMC ¶ 15.)  Plaintiff admits that Adkins did not
like people he felt were loyal to Dr. Ko.  (Pl. Dep. 60:8–61:7, 76:20–77:16.)

    Although Adkins' comments were vulgar and inappropriate, even when drawing all
inferences in favor of the Plaintiff, there is no evidence that Adkins' outburst on May 15, 2008,
was related to the prior incidents or that the remarks were gender based.  (*See infra* Part II.c.ii.)
To the contrary, Adkins' outburst was context specific and was motivated by his anger towards
Plaintiff and other members of the staff for endangering the patient and risking Adkins' job.
(Def. PH 56.1 ¶ 23; Def. QMC 56.1 ¶ 14; Adkins Dep. 52:5–24; Pl. Combined 56.1 ¶¶ 82–84,
86, 88–90.)  According to Plaintiff, "Adkins was afraid that he would not survive . . . long term
in his position" at Queens Medical Center if the CEO became upset with him.  (Pl. Combined
56.1 ¶ 82.)  According to Adkins, there were "a lot of political issues surrounding [the] cardiac
surgery programs," and he was concerned that if his team's performance was not "up to
standards," the CEO of Queens Medical Center would be "very upset."  (Adkins Dep. 56:11–
57:9; *see also* Pl. Combined 56.1 ¶ 82.)  Adkins' comments during the May 15, 2008 operating
room incident, although offensive and inappropriate, bear no relation to Adkins' prior conduct,
and Plaintiff's conclusory allegations that all of Adkins' offensive actions formed one ongoing

hostile work environment are insufficient to establish a continuing violation. *See Deras v. Metropolitan Transp. Auth.*, No. 11-CV-5912, 2013 WL 1193000, at *7 (E.D.N.Y. Mar. 22, 2013) (finding that the plaintiff's conclusory allegations were insufficient to trigger the continuing violation doctrine); *Askew v. New York*, No. 09-CV-553, 2013 WL 450165, at *7 (N.D.N.Y. Feb. 6, 2013) (holding that plaintiff's arguments and conclusory allegations were insufficient to "warrant application of the continuing violation doctrine"); *Madera v. Metro. Life Ins. Co.*, No. 99-CV-4005, 2002 WL 1453827, at *4 (S.D.N.Y. July 3, 2002) ("Plaintiff's conclusory allegations that the acts amounted to a continuing violation are an insufficient substitute for an explanation of how these distinct acts are related.").  Instead of a single "hostile work environment" spanning from 2004 to 2008, the record demonstrates a few incidents, some of which arguably contain sexual references, but none of which took place within the actionable time period.  The one incident within the actionable period — the May 15, 2008 operating room incident where Adkins yelled at Plaintiff and other members of the staff after they almost lost a patient in the operating room — is a discrete act that has no sexual references and is in no way related to the prior conduct complained about — the references by Adkins to two instruments by names that Plaintiff found to be sexual references and two physical incidents where Adkins interacted arguably inappropriately with Plaintiff, one by "brushing up against" Plaintiff and the other by "trapp[ing]" Plaintiff "directly in front of [his] crotch" by refusing to lift his leg off the desk.  The May 15, 2008 incident is therefore insufficient to trigger the continuing violation doctrine.  *See, e.g.*, *Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.*, 866 F. Supp. 2d 147, 167 (E.D.N.Y. 2011) (rejecting plaintiff's continuing violation argument because her hostile work environment claim was based on conduct outside of the statute of limitations, and the conduct within the statute of limitations was unrelated, despite plaintiff's argument that it was all part of

a single "continuing violation").  Plaintiff cannot demonstrate a continuing violation and can therefore only base her Title VII hostile work environment claim on the operating room incident as she is time barred as to all other incidents.

### ii.    Statutes of Limitations — NYSHRL and NYCHRL Claims

Under the NYSHRL and the NYCHRL, the statute of limitations is three years, *see* N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8–502(d); *see also Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248–49 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013), but is tolled during the pendency of a complaint before an administrative body, *Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247, 2013 WL 1232355, at *6 (E.D.N.Y. Mar. 26, 2013).  *See also DeNigris v. N.Y.C. Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012) ("Claims brought under the NYSHRL and NYCHRL are subject to a three-year statute of limitations, which is tolled for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter."); *Wilson v. N.Y.C. Police Dep't*, No. 09-CV-2632, 2011 WL 1215735, at *4 (S.D.N.Y. Mar. 25, 2011) ("Courts in this circuit have held that the statute of limitations applicable to claims under NYCHRL and NYSHRL is tolled during the period in which the complaint is filed with the EEOC."); *Butler v. N.Y. Health & Racquet Club*, 768 F. Supp. 2d 516, 536 (S.D.N.Y. 2011) (filing a complaint with the EEOC was sufficient to toll the statute of limitations on the state claims).

Plaintiff filed her EEOC complaint against Presbyterian Hospital and Queens Medical Center on September 16, 2008.  Plaintiff received her right to sue letter on September 29, 2009, which ended Plaintiff's tolling period.  *See DeNigris*, 861 F. Supp. 2d at 192 (explaining that the NYSHRL and NYCHRL three-year statute of limitations is tolled "between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter"); *Sundaram v. Brookhaven Nat. Labs.*, 424 F. Supp. 2d 545, 565 (E.D.N.Y. 2006) (discussing EEOC filing and tolling of

NYSHRL claims).  This action was filed on December 7, 2009.  Excluded from the three year statute of limitations are the 378 days, from September 16, 2008 to September 29, 2009, during which Plaintiff's EEOC charge was pending.  Plaintiff may therefore assert any claim which accrued on or after November 24, 2005.  NYSHRL and NYCHRL claims against Presbyterian Hospital and Queens Medical Center that accrued before November 24, 2005, are time-barred.

With regard to Plaintiff's state and city law claims against Adkins, the Honorable Dora L. Irizarry determined the expiration of the statute of limitations to be May 19, 2010, the date Plaintiff served Adkins with the Second Amended Complaint, making timely all claims that accrued as of May 19, 2007.[14]  (Docket Entry No. 37, March 3, 2011 Order at 9.)  Thus, the May 15, 2008 operating room incident, the two physical encounters with Adkins that occurred in October 2007, (Pl. Combined 56.1 ¶¶ 31–34, 36; Pl. Aff. ¶¶ 17–20), as well as Adkins' references to chest tubes that Plaintiff claims Adkins made sometime in October 2007,[15] (Pl. Combined 56.1 ¶¶ 6–7, 13; Pl. Aff. ¶¶ 7–8), are all timely and will be considered by the Court. NYSHRL and NYCHRL claims against Adkins that accrued before May 19, 2007, are time-barred.

---

[14]  This case was previously assigned to Judge Irizarry and was reassigned to the undersigned on March 26, 2012.

[15]  The record is unclear as to exactly when Adkins made these comments.  According to Plaintiff, Adkins started working at Queens Medical Center in 2005, he began making the inappropriate hand motions within the first year, and he stopped making gestures within a year after he started.  (Pl. Dep. 451:5–453:17.)  He then made the hand gestures again when a new anesthesiologist and a new scrub nurse joined the team.  (*Id*. at 445:5–448:25.)  There is no information in the record as to when new members joined the team.  Viewing the evidence in the light most favorable to Plaintiff, the Court will assume for the purposes of this motion that Adkins made these comments and gestures after May 19, 2007.

### c. Title VII Hostile Work Environment Claim

#### i. Legal Requirement

Plaintiff has failed to sufficiently establish a Title VII hostile work environment claim against Presbyterian Hospital or Queens Medical Center.  In order to establish a hostile work environment claim under Title VII, a plaintiff must produce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex, or another protected characteristic."  *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  To withstand summary judgment, Plaintiff must produce evidence that "the workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of her employment were thereby altered.'" *Mills v. S. Conn. State Univ.*, --- F. App'x ---, ---, 2013 WL 2157955, at *2 (2d Cir. May 21, 2013) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)).  If an incident is sufficiently severe, one incident may support a claim for hostile work environment. *See Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 189–90 (2d Cir. 2010). Otherwise, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* at 189–90 (quoting *Alfano v. Costello*, 294 F. 3d 365, 374 (2d Cir. 2002)).

In addition, in order to establish employer liability for hostile actions taken by employees, a plaintiff must establish that the hostile work environment can be imputed to the employer.  *See Vance v. Ball State Univ.*, 570 U.S. ---, ---, 133 S. Ct. 2434, 2443 (2013) (explaining under what circumstances an employer may be held liable for harassment by an

employee); *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) ("In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009))); *Smith v. HBO*, No. 12-CV-2177, 2013 WL 2285185, at *2 (E.D.N.Y. May 22, 2013) ("Plaintiff must also plead enough facts that the hostile work environment can be imputed to the employer in order to establish employer liability for hostile actions taken by its employees."). Where the harasser is a supervisor, an individual "empowered to take tangible employment actions against the victim," and "the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Vance*, 570 U.S. at ---, 133 S. Ct. at 2439. However, where the harasser is a co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Id.*

While "the central statutory purpose [of Title VII was] eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd*, 678 F.3d at 176 (alteration in original) (internal quotation marks omitted) (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771 (1976) and *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Second Circuit distinguishes between "[complaints of] sexual assaults; [other] physical contact[, whether amorous or hostile, for which there is no consent express or implied]; uninvited sexual solicitations; intimidating words or acts; [and] obscene language or gestures" and "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," which are not protected under the law. *Redd*, 678 F.3d at 177 (alterations in original) (citations omitted). "Conduct that is not severe or pervasive enough to

create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010). "In other words, '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 350 (E.D.N.Y. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). A plaintiff may only recover on a hostile work environment claim if the hostile work environment occurs because of an employee's protected characteristic, such as her gender. *Rivera v. Rochester Genesse Regional Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

As discussed above, all of the alleged events, except for the May 15, 2008 operating room incident, occurred outside the Title VII statute of limitations period, and Plaintiff cannot avail herself of the continuing violation doctrine. Plaintiff's Title VII claim may nevertheless survive dismissal if Plaintiff can show that there is a triable issue of fact as to whether the May 15, 2008 operating room incident was sufficiently severe to create a hostile work environment. *See Summa*, 708 F.3d at 126 (explaining that Second Circuit case law "establishes that a single incident can create a hostile environment if it is sufficiently severe"); *McGullam*, 609 F.3d at 79 ("[The plaintiff's] claim nevertheless might survive summary judgment if there were a triable issue as to whether the sole non-trivial incident occurring within the limitations period was itself of sufficient severity to support a hostile work environment claim (albeit a truncated claim premised on that single incident)." (citing *Howley v. Town of Stratford*, 217 F.3d

141, 148, 153-56 (2d Cir. 2000))); *Howley*, 217 F.3d at 153–56 ("Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was 'extraordinarily severe.' Thus, the plaintiff must demonstrate 'either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" (citations omitted)).

### ii. The May 15, 2008 Incident Was Not Severe or Gender Based

Plaintiff has failed to demonstrate that the May 15, 2008 operating room incident was severe and that Adkins treated her differently during the May 15, 2008 operating room incident because of her gender. It is undisputed that during the operating room incident, Adkins used profanities to express his anger towards Plaintiff. (Def. PH 56.1 ¶ 23; Def. QMC 56.1 ¶ 14; Adkins Dep. 52:5–24; Pl. Combined 56.1 ¶¶ 82–84, 86, 88–90.) According to Plaintiff, he verbally attacked her, yelling such things as: "Don't you ever f*cking do that again." (Pl. Aff. ¶ 64.) He screamed and yelled in a vulgar manner, cursing approximately twenty times.[16] (*Id.*) Although many of Adkins' profanities were directed at Plaintiff, Adkins also generally cursed at the entire operating room staff, and specifically cursed Dr. Yu, a male member of the operating room staff. (Pl. Dep. 73:2–25.) He also referred to DeBois, Plaintiff's male supervisor, as "Columbo," which Plaintiff viewed as derogatory towards DeBois. (*Id.* at 595:15–596:5.)

While Plaintiff alleges that some of Adkins' curses were sexual in nature — he used the term "f*ck" or "f*cking," and asked Plaintiff whether "this" was her plan to get her "f*cking Chinese boyfriend back here," referring to Dr. Ko, his predecessor, (Pl. Aff. ¶¶ 64–66) — Plaintiff concedes that the term "f*ck" could be used in different contexts and admits that she did

---

[16] Plaintiff claims that this incident lasted "for hours," (Pl. Aff. ¶ 64), but provides no evidence as to any other objectionable conduct other than Adkins' use of profanities, specifically those directed towards her, which are discussed in this memorandum and order. (*Id.*; *see also* Pl. Dep. 73:6–74:3.)

not believe Adkins was "inferring" that Dr. Ko was, in fact, her boyfriend. (Def. QMC 56.1 ¶ 15; Pl. 56.1-QMC ¶ 15; Pl. Dep. 550:2–20.) Plaintiff admitted that Adkins did not like people he felt were loyal to Dr. Ko, and that was why she had an "intuition" that he would blame her for the problem in the operating room on May 15, 2008. (Pl. Dep. 60:8-61:7, 76:20-77:16; 332:18–333:9.) Thus, as Plaintiff admits, this reference was vulgar but not sexual in nature. It arose out of Adkins' anger about the events that transpired with the patient, dislike of individuals loyal to his predecessor and fear for his job. (Pl. Dep. 597:23–598:15, 608:5–9.) The May 15, 2008 operating room incident involved foul language and abusive behavior, and, as Judge Irizarry found in March 2011, and the Court so finds, it "did not involve discrimination on the basis of sex." (Docket Entry No. 37, March 3, 2011 Order at 9; *see also* Docket Entry No. 56, March 12, 2012 Order at 5.) *See, e.g.*, *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 678 (S.D.N.Y. 2012) ("While certainly not a polite way to treat subordinates, it is impossible to draw any inference of discriminatory intent from the fact that [the offender] yelled at an African–American woman, who was not where she was supposed to be."), *appeal dismissed* (2d Cir. Aug. 14, 2012); *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 521 (S.D.N.Y. 2010) ("Thus, although [plaintiff's] work environment may have been unpleasant — even 'hostile' in ordinary parlance — his discrimination claim must be dismissed because the circumstances do not permit an inference that '[ ]he was singled out for mistreatment because of [his] sex.'" (quoting *Alfano*, 294 F.3d at 375)); *Faison v. Leonard St., LLC*, No. 08-CV-192, 2009 WL 636724, at *4 (S.D.N.Y. Mar. 9, 2009) (dismissing a hostile work environment claim because "allegations of persistent shouting and a display of poor temperament are insufficient to state a plausible hostile-environment claim").

Since Plaintiff has not identified a single specific instance within the relevant statute of limitations period in which she was treated differently on account of her gender, she cannot sustain a Title VII hostile work environment claim, and this claim is dismissed. *See, e.g.*, *Johnson v. City of New York*, No. 10-CV-6294, 2012 WL 1076008, at *8 (S.D.N.Y. Mar. 28, 2012) (granting defendants summary judgment on plaintiff's hostile work environment claim because plaintiff "presented no evidence that he was subject to *any* discrimination based on his [protected status] within the statute of limitations time frame"); *Stathatos v. Gala Res., LLC*, No. 06-CV-13138, 2010 WL 2024967, at *4 (S.D.N.Y. May 21, 2010) (granting defendants' motion for summary judgment on plaintiff's racially based hostile work environment Title VII claim because she did not allege that any of the conduct giving rise to that claim occurred within the statute of limitations period). In addition, for the reasons discussed below, even if the Court were to consider all of the alleged conduct, including the conduct outside the applicable Title VII statute of limitation period but within the NYSHRL and NYCHRL statute of limitations period that is supported by admissible evidence, Plaintiff nevertheless could not survive summary judgment on her Title VII hostile work environment claim.

### d. NYCHRL and NYSHRL Hostile Work Environment Claims

NYSHRL hostile work environment claims are analyzed under the same standard as Title VII hostile work environment claims. *See Summa*, 708 F.3d at 123–24 ("Hostile work environment claims under both [federal law] and the NYSHRL are governed by the same standard." (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))); *see also Rivera*, 702 F.3d at 693 n.4 (explaining that the same standards that applied to the plaintiff's Title VII hostile work environment claim also applied to his hostile work environment claim arising under the NYSHRL). The NYCHRL does not differentiate between discrimination and

hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a). *Sotomayor*, 862 F. Supp. 2d at 261 ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims."). Though for many years the Second Circuit "construed the NYCHRL to be coextensive with its federal and state counterparts," the New York City Council amended the NYCHRL in 2005 and "[a]s amended, the NYCHRL requires an independent analysis." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–09 (2d Cir. 2013). The NYCHRL requires that "its provisions 'be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws . . . have been so construed.'" *Id.* at 109 (quoting N.Y.C. Admin. Code § 8–130); *see also Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 365–66 (S.D.N.Y. 2011) ("[T]he Second Circuit has directed the district courts to conduct an analysis of the NYCHRL claims that is separate from that undertaken for Title VII and New York State Human Rights Law claims." (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278–79 (2d Cir. 2009))).

As discussed above, Plaintiff may bring NYCHRL and NYSHRL hostile work environment claims against Presbyterian Hospital and Queens Medical Center based on acts that occurred on or after November 24, 2005 and against Adkins based on acts that occurred on or after May 19, 2007. (*See supra* Part II.b.ii.) Therefore, Plaintiff's claims under the NYCHRL and the NYSHRL will be analyzed to include the references by Adkins to chest tubes as "a pair of 36s" and "mister softie," the two physical incidents in the perfusionist's office in October 2007 where Plaintiff asserts Adkins interacted inappropriately with her, and the May 15, 2008 operating room incident. (Pl. Opp'n 20.)

### i. NYCHRL

Under the NYCHRL, a plaintiff need not establish that the conduct was severe or pervasive, only that "she has been treated less well than other employees because of her gender." *Mihalik*, 715 F.3d at 110; *see also Kolenovic v. ABM Indus. Inc.*, 361 F. App'x 246, 248 (2d Cir. 2010) (holding that NYCHRL hostile work environment claims should not be analyzed under the "severe or pervasive" standard but a more liberal standard (citing *Loeffler*, 582 F.3d at 278)); *Kerman-Mastour*, 814 F. Supp. 2d at 365–66 (explaining that under NYCHRL, "in cases where an employee argues that he or she was subjected to a hostile work environment, plaintiffs need not prove that the atmosphere was 'severe or pervasive,' a showing they are required to make under Title VII"). However, "the NYCHRL, like Title VII and the NYSHRL, is still not a general civility code, and petty slights and trivial inconveniences are not actionable." *Davis-Bell*, 851 F. Supp. 2d at 671 (internal quotation marks omitted); *see also Bermudez*, 783 F. Supp. 2d at 579 (explaining that under NYCHRL, conduct need not be "severe or pervasive" to constitute a hostile work environment, although "'petty, slight, or trivial inconvenience[s]' are not actionable" (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38–42 (App. Div. 2009)). Isolated incidents of unwelcome verbal and physical conduct have been found to constitute the type of "petty slights and trivial inconveniences" that are not actionable even under the more liberal NYCHRL standard. *See, e.g.*, *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 505–06 (S.D.N.Y. 2010) (finding that the plaintiff could not sustain a sexual harassment claim under NYCHRL where her supervisor "[told] a crude anecdote from his sex life with another woman, and occasionally refer[ed] to [the plaintiff] as voluptuous and knock[ed] her knee").

Moreover, a plaintiff must still establish that she suffered a hostile work environment *because of her gender. See, e.g., Margherita v. FedEx Exp.*, 511 F. App'x 71, 72 (2d Cir. 2013) (finding that there was no evidence that plaintiff suffered a hostile work environment because of his protected status "even under the broad and liberal construction of the NYCHRL"); *Lennert-Gonzalez v. Delta Airlines, Inc.*, No. 11-CV-1459, 2013 WL 754710, at *8 (S.D.N.Y. Feb. 28, 2013) (dismissing on summary judgment the plaintiff's NYCHRL hostile work environment claim because the plaintiff had failed to show that any incidents were based on animus directed towards plaintiff's protected class rather than "[p]ersonal animus"); *Rozenfeld v. Dep't of Design & Const. of N.Y.C.*, No. 10-CV-4002, 2012 WL 2872157, at *15 (E.D.N.Y. July 12, 2012) (holding that the few instances alleged by the plaintiff did not demonstrate animus and were too minor to meet NYCHRL's hostile work environment standard); *Sotomayor*, 862 F. Supp. 2d at 261 (dismissing plaintiff's NYCHRL hostile work environment claim because "plaintiff cannot show that a hostile work environment was created 'because of her race, age, or national origin'"); *Bermudez*, 783 F. Supp. 2d at 579 ("[T]o survive summary judgment [on her NYCHRL hostile work environment claim], [the plaintiff] need only adduce evidence of 'the existence of unwanted gender-based conduct' because liability under NYCHRL is 'determined by the existence of unequal treatment.'" (quoting *Williams*, 872 N.Y.S.2d at 38–39)).

In support of her hostile work environment claim, Plaintiff alleges that Adkins would repeatedly ask for a pair of 36 chest tubes as a "pair of 36s," while holding his hands "as if he were grabbing a woman's breasts," and refer to a different chest tube as "mister softie."[17]  (Pl. Aff. ¶ 9.)  According to Plaintiff, Adkins made these references on numerous occasions,

---

[17]  Plaintiff herself testified that a "pair of 36s" is regular verbage for the specific type of chest tube Adkins was referencing.  (Pl. Dep. 340:2–21.)

specifically when there was new personnel in the operating room. (Pl. Combined 56.1 ¶ 10.)

Plaintiff also alleges that Adkins made her feel uncomfortable during two incidents in the small

perfusion office — one in which he brushed against Plaintiff's body as he walked past her, and

the other in which he "trapped" Plaintiff "directly in front of [his] crotch" by refusing to lift his

leg up as she tried to walk past to retrieve medical equipment. (Pl. Combined 56.1 ¶¶ 31–34; Pl.

Dep. 215:4–216.23, 321:8–324:16.) In addition, Plaintiff has provided evidence that Adkins

yelled profanities at her during the May 15, 2008 operating room incident. (*See, e.g.*, Pl.

Combined 56.1 ¶¶ 82–90; Adkins Dep. 52:21–24.)

Considering the totality of these circumstances, a reasonable jury could not find that

Plaintiff was treated less well than other employees because of her gender. Plaintiff admits that

Adkins directed the "pair of 36s" and "mister softie" references to the entire operating room

staff, not just to Plaintiff and not just to women. (Pl. Dep. 370:12–371:3.) Similarly, Adkins

cursed at the entire staff, including Dr. Yu, a male staff member, during the May 15, 2008

operating room incident. Thus, there is no evidence from which a reasonable jury could find a

violation of the NYCHRL based on this conduct. *See Mihalik*, 715 F.3d at 110 ("It is not enough

[under the NYCHRL] that a plaintiff has an overbearing or obnoxious boss. She must show that

she has been treated less well at least in part '*because of* her gender.'"); *Fattoruso v. Hilton*

*Grand Vacations Co.*, 873 F. Supp. 2d 569, 578 (S.D.N.Y. 2012) (finding that plaintiff failed to

state a NYCHRL hostile work environment claim where plaintiff failed to establish that he was

treated differently because of his gender and both men *and women* found the team leader's

behavior unfair and disgusting), *aff'd*, No. 12-CV-2405, 2013 WL 2123088 (2d Cir. May 17,

2013).

To the extent Plaintiff complains of the curses by Adkins specifically directed towards her, she has failed to demonstrate that Adkins' conduct on the day of the operating room incident was gender based. As previously discussed, although many of Adkins' profanities during the May 15, 2008 operating room incident were directed at Plaintiff, the evidence establishes that Adkins directed more of his profanities at Plaintiff than at other staff members because she had left the operating room, not because of her gender. (*See infra* Part II.c.) *See Casalino v. N.Y.S. Catholic Health Plan, Inc.*, No. 09-CV-2583, 2012 WL 1079943, at *8–9 (S.D.N.Y. Mar. 30, 2012) (finding that the plaintiff failed to state a NYCHRL hostile work environment claim, even though she claimed that her supervisor "berated her and frightened her, [and] reduced her to tears to the point where she could not leave her office," because she failed to raise an inference that the conduct occurred *because* of her gender); *Davis-Bell*, 851 F. Supp. 2d at 678 (finding that the plaintiff's supervisor yelling at a subordinate, also in plaintiff's protected class, to return to where she was supposed to be on a particular day, "[w]hile certainly not a polite way to treat subordinates," did not establish that the supervisor harbored discriminatory animus under NYCHRL); *Short v. Deutsche Bank Sec., Inc.*, 913 N.Y.S.2d 64, 67 (App. Div. 2010) (finding that plaintiff's complaints about the manager's conduct in the workplace — e.g. that the manager "tried to push [the plaintiff] out by not talking to her, [and] criticizing her unfairly" — were "nothing more than non-actionable petty slights and minor inconveniences, which in any event may be viewed by a reasonable employee as a function of the manager's personal management style, unrelated to gender discrimination").[18] While Adkins may have made Plaintiff feel

---

[18] Plaintiff's general conclusory allegations that Adkins treated her, and all women, in an "inappropriate and demeaning manner" on a regular basis, made "comments of an underlying sexual nature," and acted "in a physically intimidating manner towards women," (Pl. Combined 56.1 ¶¶ 6–7; Pl. Aff. ¶¶ 7–8), without identifying any such conduct, other than as discussed in

uncomfortable by brushing against her when allowing her to pass by him in the small perfusion

office and temporarily preventing her from retrieving medical equipment by trapping her with

his leg, these two isolated incidents over the four-year period that Adkins and Plaintiff worked

together are de minimus and do not rise to more than "petty slights or trivial inconveniences."

*See Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 404 (S.D.N.Y. 2012)

(plaintiff's allegations that his supervisor stood too close to him, such that her vagina was near

his left shoulder and his nose was near her stomach, did "not violate even the lower threshold of

the NYCHRL, which is not intended to operate as a general civility code" (internal quotation

marks omitted)); *Magnoni*, 701 F. Supp. 2d at 505–06 (finding that a reasonable person in

plaintiff's employment position would not have perceived her supervisor's behavior — "telling a

crude anecdote from his sex life with another woman, and occasionally referring to [the plaintiff]

as voluptuous and knocking her knee" — as sexual harassment under NYCHRL); *see also*

*Mihalik*, 715 F.3d at 111 (explaining that an employer may prevail on summary judgment on a

---

this memorandum, is not supported by any evidence other than Plaintiff's conclusory allegations
and therefore provides no support for Plaintiff's hostile work environment claim. *See Aiossa v.
Bank of Am., N.A.*, --- F. App'x ---, ---, 2013 WL 4733930, at *1 (2d Cir. Sept. 4, 2013)
(analyzing plaintiff's NYSHRL and NYCHRL claims and explaining that in order to "resist a
motion for summary judgment, a party must provide more than conclusory allegations and must
show more than some metaphysical doubt as to the material facts" (internal quotation marks
omitted) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010))); *Davis-
Bell*, 851 F. Supp. 2d at 677 (holding that plaintiff's conclusory statement that no other
individuals outside her protected class suffered similar abuse amounted to a subjective and
unsupported belief that was insufficient to raise a genuine issue of material fact under the
NYCHRL); *Barounis v. N.Y.C. Police Dep't*, No. 10-CV-2631, 2012 WL 6194190, at *5
(S.D.N.Y. Dec. 12, 2012) ("[A] plaintiff bringing a workplace discrimination claim must make
more than conclusory allegations in order to defeat a motion for summary judgment. It is
incumbent upon courts to 'distinguish between evidence that allows for a reasonable inference of
discrimination and evidence that gives rise to mere speculation and conjecture.' And '[a]lthough
claims under the NYCHRL are more liberally construed than claims under Title VII and the
NYSHRL, the NYCHRL does not alter the kind, quality or nature of evidence that is necessary
to support or defeat a motion for summary judgment under Rule 56.'" (footnotes and internal
quotation marks omitted)).

plaintiff's NYCHRL hostile work environment claim "if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight" or trivial inconvenience); *Barounis v. New York City Police Dep't*, No. 10-CV-2631, 2012 WL 6194190, at *9 (S.D.N.Y. Dec. 12, 2012) ("The NYCHRL . . . is not a general civility code and petty slights and trivial inconveniences are not actionable under it." (footnotes and internal quotation marks omitted))).

Adkins may have said offensive and inappropriate comments, acted inappropriately on occasion, and may have been a difficult person to work with, but there is no evidence he created an environment that was particularly difficult for women, subjected Plaintiff to unwanted sexual attention, or otherwise treated Plaintiff "less well" because she was a woman. *See Mihalik*, 715 F.3d at 110 (explaining that under the NYCHRL, a plaintiff "must show that she has been treated less well at least in part '*because of* her gender'" (quoting *Williams*, 872 N.Y.S.2d at 39–40 n.27)); *Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303, 2013 WL 1316712, at *17–18 (E.D.N.Y. Mar. 28, 2013) (finding that plaintiff's evidence "fail[ed] to give rise to an inference that she was treated unequally because of her protected characteristics" and therefore failed to raise a genuine issue of material fact regarding plaintiff's NYCHRL hostile work environment claim"). Plaintiff has failed to raise a genuine issue of fact as to whether she was discriminated against because of her gender, and therefore cannot establish a discrimination claim under the NYCHRL. *See Gelin v. City of New York*, No. 10-CV-5592, 2013 WL 2298979, at *12–13 (E.D.N.Y. May 24, 2013) (finding that plaintiff's NYCHRL hostile work environment claim failed because she did not offer "any evidence establishing that she was treated less well because of her . . . gender"); *Davis-Bell*, 851 F. Supp. 2d at 671 (finding that the plaintiff failed to raise a triable issue of fact as to whether the plaintiff "ha[d] been treated less well than other employees

because of her gender" under the NYCHRL); *Casalino*, 2012 WL 1079943, at *8–9 ("A

NYCHRL hostile work environment claim requires that Plaintiff prove . . . that she has been

treated less well than other employees *because* of her gender." (internal quotation marks omitted)

(quoting *Williams*, 872 N.Y.S.2d at 39)).

### ii.   NYSHRL

As discussed above, the standard for evaluating NYSHRL claims is the same as the

standard for evaluating Title VII hostile work environment claims.  *See Kelly v. Howard I.*

*Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("The standards for

evaluating hostile work environment . . . claims are identical under Title VII and the NYSHRL."

(citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000))); *Summa*, 708 F.3d at

123–24 ("Hostile work environment claims under both Title VII and the NYSHRL are governed

by the same standard." (citing *Schiano*, 445 F.3d at 609)).  Title VII and NYSHRL claims are

subject to a higher standard than NYCHRL claims.  *See Mihalik*, 715 F.3d at 109 (explaining

that NYCHRL standards are broader than federal and state law standards); *Bermudez*, 783 F.

Supp. 2d at 579 ("The standard for maintaining a hostile work environment claim is lower under

the NYCHRL.").  Therefore, where a plaintiff cannot sustain a claim pursuant to the broader

NYCHRL standard, the plaintiff's NYSHRL and Title VII claims also fail.

Based on the evidence before the Court, Plaintiff cannot sustain a claim pursuant to the

NYCHRL, and therefore the Court grants Defendants' summary judgment motions as to

Plaintiff's NYCHRL and NYSHRL hostile work environment claims.

## II.   Retaliation Claims

At oral argument, the Court granted Defendants' motions for summary judgment as to

Plaintiff's retaliation claims under Title VII, NYSHRL and NYCHRL.  Under the Supreme

Court's recent decision in *University of Texas Southwestern Medical Center v. Nassar*, "Title VII

retaliation claims must be proved according to traditional principles of *but-for* causation . . . .

This requires proof that the unlawful retaliation would not have occurred in the absence of the

alleged wrongful action or actions of the employer."  570 U.S. ---, ---, 133 S. Ct. 2517, 2533

(2013) (emphasis added).  As explained on the record, Plaintiff cannot establish that she would

not have been terminated following the operating room incident in May 2008 had she not

previously complained about Adkins' inappropriate behavior as required by *Nassar*.  The Court

now explains more fully the reason for its decision to dismiss Plaintiff's NYSHRL and

NYCHRL retaliation claims.

### a. NYSHRL Retaliation Claim

Traditionally, "[t]he standards for evaluating . . . retaliation claims are identical under

Title VII and the NYSHRL."  *Kelly*, 716 F.3d at 14 (citing *Weinstock*, 224 F.3d at 42 n.1);

*Vandewater v. Canandaigua Nat. Bank*, 893 N.Y.S.2d 916 (2010) ("It is well settled that the

federal standards under [T]itle VII of the Civil Rights Act of 1964 are applied to determine

whether recovery is warranted under the Human Rights Law." (citing *Forrest v. Jewish Guild for

the Blind*, 3 N.Y.3d 295, 330 (2004))); *Forrest*, 3 N.Y.3d at 330 (stating that "[b]ecause both the

[New York State] Human Rights Law and [T]itle VII address the same type of discrimination,

afford victims similar forms of redress, are textually similar and ultimately employ the same

standards of recovery, federal case law in this area also proves helpful to the resolution of this

appeal" (quoting *Matter of Aurecchione*, 98 N.Y.2d 21, 26 (2002)).  New York State courts have

yet to address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, nor

has the Second Circuit had the opportunity to address this issue.  However, the relevant

provisions of Title VII and NYSHRL are textually similar, and both prohibit an employer from

discriminating or retaliating against an individual "because" he or she engaged in protected

activity.  In *Nassar*, the Supreme Court held that under "the default rules" of statutory

construction, "causation" should be interpreted as "but-for causation" "absent an indication to the contrary in the statute itself," and interpreted Title VII's use of "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2528. Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under NYSHRL consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*. *See, e.g.*, *Leacock v. Nassau Health Care Corp.*, No. 08-CV-2401, 2013 WL 4899723, at *9 n.4 (E.D.N.Y. Sept. 11, 2013) (continuing to construe the NYSHRL retaliation standard as requiring the same elements as Title VII after *Nassar* (citing *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, ---, 2013 WL 4432354, at * 19 n.12 (E.D.N.Y. Aug. 14, 2013))); *Dall*, --- F. Supp. 2d at ---, 2013 WL 4432354, at * 19 n.12 (interpreting the plaintiff's NYSHRL retaliation claim consistent with his Title VII retaliation claim after *Nassar*); *Brown v. City of New York*, 2013 WL 3789091, at *19 (reviewing the but-for causation requirement for Title VII retaliation articulated in *Nassar* and stating that the plaintiff's "retaliation claim under the NYSHRL is 'analytically identical to [her] claims brought under Title VII'" (citation omitted)). Since Plaintiff could not satisfy the but-for causation standard required by *Nassar*, the Court dismissed Plaintiff's NYSHRL retaliation claim.

### b. NYCHRL Retaliation Claim

Under the NYCHRL, retaliation claims, similar to discrimination claims, are viewed under a broader interpretation than Title VII and NYSHRL and must be analyzed independently. *See Mihalik*, 715 F.3d at 112 (explaining the standard for evaluating retaliation claims under the NYCHRL). Section 8-107(7) of the NYCHRL prohibits employers from "retaliat[ing] . . . in any manner against any person because such person has . . . opposed any practice forbidden under

this chapter." N.Y.C. Admin. Code § 8–107(7).  Prior to *Nassar*, the Second Circuit explained

that, in order "to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that

she took an action opposing her employer's discrimination, and that, as a result, the employer

engaged in conduct that was reasonably likely to deter a person from engaging in such action."

*Mihalik*, 715 F.3d at 112 (citations omitted).  Although the NYCHRL retaliation provision

contains the same "because" language as the Title VII and NYSHRL provisions, the City

Council has established two new rules of construction for interpreting NYCHRL claims:

> First, it created a one-way ratchet, by which interpretations of state
> and federal civil rights statutes can serve only as a floor below
> which the City's Human Rights law cannot fall.   Second, it
> amended the NYCHRL to require that its provisions be construed
> liberally for the accomplishment of the uniquely broad and
> remedial purposes thereof, regardless of whether federal or New
> York State civil and human rights laws, including those laws with
> provisions comparably-worded to provisions of this title[,] have
> been so construed.

*Mihalik*, 715 F.3d at 109 (alteration in original) (citations and internal quotation marks omitted).

Since "the NYCHRL has been amended to abolish the parallelism between the [NYCHRL] and

federal and state anti-discrimination law," *Noel v. BNY-Mellon Corp*., 514 F. App'x 9, 11 (2d

Cir. Mar. 14, 2013), and is interpreted according to its own rules of construction, the Court does

not apply the *Nassar* but-for causation standard to Plaintiff's NYCHRL retaliation claim.

However, a plaintiff must still establish that there was a causal connection between her protected

activity and the employer's subsequent action, and must show that a defendant's legitimate

reason for her termination was pretextual or "motivated at least in part by an impermissible

motive."  *Brightman v. Prison Health Serv., Inc.*, --- N.Y.S.2d ---, ---, 108 A.D.3d 739, 741

(App. Div. 2013).

Plaintiff argues that she was terminated on May 28, 2008, for filing a formal complaint

against Adkins on May 22, 2008.  As explained on the record, Plaintiff's argument rested on the

temporal proximity between her complaints and her termination, and even under the lower "motivating factor" standard, "temporal proximity" is insufficient to establish that her termination resulted, at least in part, from the filing of her complaint. *See Ben-Levy v. Bloomberg, L.P.*, --- F. App'x ---, ---, 2013 WL 1810953, at *20 (2d Cir. May 1, 2013) (explaining that, where plaintiff's retaliation claim was based just on temporal proximity, the plaintiff failed to provide evidence from which a reasonable jury could conclude that the defendant was motivated by retaliation, and therefore his NYCHRL claim failed, even though the NYCHRL is reviewed "independently from and more liberally than" federal or state discrimination claims). Defendants demonstrated a legitimate reason for terminating Plaintiff's employment: Plaintiff left the operating room while a patient was undergoing surgery, having been warned and disciplined for similar behavior on a prior occasion. Moreover, Defendant has presented evidence that the decision to terminate Plaintiff was made prior to Plaintiff's oral and written complaint to Bautista following the May 15, 2008 operating room incident. (Def. PH 56.1 ¶¶ 31–32, 34–35; Bautista Dep. 22:5–12, 26:1–27:19.) *See Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 42 (App. Div. 2012) ("[A]n employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct."); *see also Mihalik*, 715 F.3d at 115 (inquiring into whether the plaintiff's supervisor intended to fire the plaintiff before she complained about his behavior when evaluating the plaintiff's NYCHRL retaliation claim).

Based on the evidence before the Court, no reasonable jury could find that Plaintiff was terminated because of her complaint about Adkins. *See Brightman*, --- N.Y.S.2d at ---, 108 A.D.3d at 739 (holding that plaintiff's "unsupported assertion that the . . . defendants'

nonretaliatory reasons for the challenged actions were pretextual was insufficient to raise a triable issue of fact" regarding the NYCHRL claim); *Bryant v. Merrill Lynch, Pierce, Fenner & Smith*, No. 12-CV-2940, 2013 WL 2359109, at *5 (S.D.N.Y. May 30, 2013) ("Because the federal and state retaliation claims on which summary judgment is granted fail because of the absence of retaliatory animus, they also fail under the broader NYCHRL."); *Shih v. JPMorgan Chase Bank, N.A.*, No. 10-CV-9020, 2013 WL 842716 (S.D.N.Y. Mar. 7, 2013) (granting defendant's motion for summary judgment on plaintiff's NYCHRL claim because "[n]o rational jury could find that [the defendant] retaliated 'in any manner' against the plaintiff"), *motion for relief from judgment denied*, 2013 WL 3242709 (S.D.N.Y. June 28, 2013).

## III. Conclusion

For the reasons discussed above, the Court grants Defendants' motions for summary judgment.

SO ORDERED:

___s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 23, 2013
        Brooklyn, New York